JAMES W. MCCONKIE, 2156
BRADLEY H. PARKER, 2519
W. ALEXANDER EVANS, 12085
PARKER & MCCONKIE
5664 South Green Street
Salt Lake City, Utah 84123
Telephone: (801) 264-1950
Facsimile: (801) 266-1338
jwmcconkie@utahlawhelp.com
bparker@utahlawhelp.com
alex@sjatty.com

*Attorneys for Plaintiffs*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF UTAH

| | |
|---|---|
| JILL McCLUSKEY and MATTHEW McCLUSKEY, individually and for and on behalf of LAUREN McCLUSKEY, deceased, <br><br>        Plaintiffs, <br><br> v. <br><br> STATE OF UTAH (including the University of Utah, University Department of Housing and Residential Education and University Department of Public Safety), DALE BROPHY, KORY NEWBOLD, KAYLA DALLOF, MIGUEL DERAS, TODD JUSTENSEN, HEATHER McCARTHY, EMILY THOMPSON and JANE/JOHN DOES 1-10. <br><br>        Defendants. | **COMPLAINT** <br><br> 1.  Title IX <br> 2.  Equal Protection (individual liability) <br> 3.  Equal Protection (municipal liability) <br> 4.  Equal Protection (failure to train) <br> 5.  Interest on Special Damages <br><br> (**Jury Trial Demanded**) <br><br> Case No. 2:19-cv-00449-HCN <br> Judge Howard C. Nielson, Jr. |

Plaintiffs, Jill McCluskey and Matthew McCluskey, by and through their counsel of

record, Bradley H. Parker, James W. McConkie and W. Alexander Evans of the law firm of

Parker & McConkie, hereby bring this action on their own behalf and on behalf of Plaintiff

Lauren McCluskey, deceased, against Defendant State of Utah (including the University of Utah, University Department of Housing and Residential Education and University Department of Public Safety) (collectively the "University") and against Defendants Dale Brophy, Kory Newbold, Kayla Dallof, Miguel Deras, Todd Justensen, Heather McCarthy, Emily Thompson and Jane/John Does 1-10 ("Individual Defendants"), alleging their deliberate indifference and failure to intervene and prevent the tragic and untimely death of Lauren McCluskey.  The allegations are as follows:

<u>INTRODUCTION</u>

1.      This is a civil rights case involving the tragic, avoidable and untimely death of Lauren McCluskey, a 21 year-old University of Utah track star and student who was shot seven times and brutally murdered by her ex-boyfriend, Melvin Rowland, on the University of Utah campus.  This preventable murder occurred as a direct result of the University's refusal to respond to multiple concerning reports of stalking, abuse, intimidation, dating violence, domestic violence, sexual harassment, gender based discrimination and other dangerous and abusive behaviors prohibited under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a).

2.      Indeed, despite the fact that Lauren and fellow students contacted the University of Utah more than 20 times to report Melvin Rowland's abuse and did everything that they could to obtain help with regard to their concerns of escalating violence, the University and the Individual Defendants failed to take any action reasonably calculated to end the abuse and prevent its reoccurrence or to otherwise investigate the allegations, thereby acting with deliberate indifference and subjecting Lauren to further and ongoing abuse.  The University's response to the reports of abuse was clearly unreasonable in light of the information it received and its

deliberate indifference to the information ultimately deprived Lauren of her access to an education and resulted in Lauren's predictable, preventable and tragic death.

3.      Pursuant to the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act ("Clery Act"), 20 USC § 1092(f), "dating violence" is "committed by a person who is or has been in a social relationship of a romantic or intimate nature with the victim" to include sexual or physical abuse or the threat of such abuse.  It also includes "stalking," which is defined as "a course of conduct directed at a specific person that would cause a reasonable person to—[f]ear for the person's safety or the safety of others; or [s]uffer substantial emotional distress."  The Clery Act defines a "course of conduct" to "mean[] two or more acts, including, but not limited to, acts in which the stalker directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about a person, or interferes with a person's property."

4.      Similarly, pursuant to Utah law, domestic violence occurs when a person who is or was in a consensual sexual relationship with another party (*i.e.* a "cohabitant") commits, attempts to commit or threatens to commit any criminal offense involving "violence or physical harm" against the other party (i.e. against a fellow "cohabitant") regardless of whether the parties live together or are married.  Utah Code §77-36-1(4).  Criminal offenses that involve "violence or physical harm" include, but are not limited to, assault, harassment, electronic communication harassment, stalking, tampering with a witness, retaliation against a victim, unlawful distribution of an intimate image and voyeurism.  *Id.*  Accordingly, crimes such as stalking are considered a form of domestic violence when such crimes are committed against a current or former sexual partner.  In addition to criminal offenses, domestic violence and dating violence are forms of

sexual harassment, which are in turn forms of gender based discrimination that are prohibited by Title IX.

5.      Domestic violence, dating violence and other forms of sexual harassment are widespread and serious problems on university campuses and throughout the United States, which disproportionately affect women and often have deadly consequences.  For example, 21% of college students have experienced dating violence at the hands of a current partner with 32% experiencing dating violence at the hands of a former partner.  Over 13% of college women report they have been stalked and 42% by a boyfriend or ex-boyfriend.  Nearly one third of college students report having physically assaulted a dating partner in the previous 12 months. Fifty women in the United States are killed every month by gun violence alone at the hands of an intimate partner.  Twenty people in the United States are assaulted by an intimate partner every minute.

6.      Moreover, three quarters of the abusers who ultimately killed their intimate partners engaged in stalking of the intimate partners before killing them.  In addition to stalking, several other factors are known to significantly increase the risk of violence or death at the hands of an intimate partner and such factors are commonly evaluated to assess the danger for those at risk.  Such factors include, but are not limited to: a short courtship, extreme jealousy, isolation from friends or family, attempts to monitor or control daily activities, stalking, substance abuse, chronic unemployment, access to a gun, prior instances of domestic violence or dating violence, threats to harm or kill the victim, threats of suicide from the abuser, forced sex, manipulative behavior, visions of grandiosity, profound narcissism, lies about military service, bravery or heroism, exaggerated fear of danger associated with the outside world or any attempt by the

victim to end the relationship.  In fact, danger to the victim *drastically* increases when a victim

leaves an abuser, remains extremely high for three months, dips slightly for the next nine months

and drops off precipitously after one year.  Other warning signs of abusive behavior that are

often evident with respect to the victim include, but are not limited to: unexplained bruising,

depression, chronic fatigue, changes in personality or appearance, changes in eating or sleeping

patterns, a decline in self-esteem, increased worry about pleasing, displeasing or angering the

other partner and constantly checking in with the other partner.

7.     Among other things, the University of Utah's "primary prevention and awareness

programs" regarding "Sexual Misconduct" indicates that the University provides all of its

employees with "[i]nformation on risk reduction to ***recognize warning signs of abusive behavior***

and how to avoid personal attacks."  Rule 1-012B(III)(1)(e) (emphasis added).  Accordingly,

University employees should have been able to recognize the warning signs associated with

Melvin Rowland's abusive behavior and should have known how Lauren could avoid personal

attacks.

8.     Lauren's death arose from a set of circumstances that should have alerted the

University and Individual Defendants to the fact that one of their students was in extreme peril of

being seriously harmed or killed as a result of domestic violence or dating violence.  In addition

to direct reports of domestic violence and dating violence, the classic warning signs of such

behavior were repeatedly reported to the University, but no investigation occurred, no plans were

developed or implemented and no effort was made to take any meaningful action reasonably

calculated to end the harassment or to otherwise prohibit Melvin Rowland from having ongoing

access to the University's campus.

*A Pattern of Dating/ Domestic Violence*

9.      Lauren started dating Melvin Rowland in September of 2018.  He was a large, powerful and handsome man who was over 6 feet tall and weighed approximately 250 pounds. Lauren did not have much experience dating and at first, Melvin Rowland seemed attentive and respectful, but Lauren did not know that Melvin Rowland was lying about his name and age, among other things, to hide the fact that he was a dangerous felon and registered sex offender.

10.      Within a very short time, the relationship began to sour.  Melvin Rowland became extremely possessive, controlling and manipulative as a pattern of dating violence and domestic violence emerged.  Among other things Melvin Rowland was unabashedly jealous; he employed various tactics to control Lauren's daily activities; he isolated Lauren from her friends and family; he stalked Lauren, monitoring her whereabouts and activities both on and off campus; he was profoundly narcissistic; he was chronic liar.  Melvin Rowland became unemployed, relied on Lauren for food and shelter and gained access to a gun.

11.      Fellow students and friends of Lauren's began to notice changes in her affect and appearance.  Lauren had lost weight, she looked exhausted and stressed out, her eyes were glassy and hollow, she stopped wearing makeup, she was not taking care of herself, she was not paying attention to her studies, she was not eating well and she seemed defeated.  Lauren's friends noticed that she would constantly check in with Melvin Rowland and would go out of her way to avoid displeasing him in any way.  Even more concerning, Lauren's friends began to notice bruising on Lauren's body.  Sadly, the warning signs suggesting that Melvin Rowland was abusing Lauren were staggering in number as were the indications that Melvin Rowland's abusive behavior would eventually result in physical harm or death.

12.     Lauren was profoundly shaken when she discovered that Melvin Rowland had lied about his name and age and when she found out that he was a registered sex offender who had been convicted of a second-degree felony for the enticement of a minor over the internet and of a third-degree felony for attempted forcible sexual abuse.  Separate crimes committed just a few days apart.  Although Melvin Rowland's sentence started on July 19, 2004 and should have kept him in prison until 2019, he had been released early and was on parole at the time that he violently murdered Lauren.

### *A Preventable Campus Murder*

13.     As soon as Lauren discovered Melvin Rowland's lies, his alarming secrets and his dangerous history, she ended her relationship with him.  Melvin Rowland was infuriated by this. In retaliation, he harassed Lauren relentlessly with electronic communications, he stalked Lauren on and off campus directly, indirectly and through third parties via a variety of different methods and means, he threatened to kill himself to manipulate Lauren, he extorted Lauren by threatening to publish a compromising image of her, he intimidated Lauren when she contacted the police in an attempt to scare her into withholding information regarding his criminal behavior and he impersonated a police officer in an attempt to lure Lauren away from her dormitory.

14.     Despite having actual knowledge that Melvin Rowland was harassing Lauren and stalking her, which are by definition offenses involving "violence or physical harm," and despite receiving other information sufficient to alert the University to the possibility that Lauren was otherwise a victim of domestic violence, dating violence and sexual harassment, the University's Department of Housing and Residential Education ("Department of Housing") acted with deliberate indifference and conscious disregard of the deadly situation, and thus failed to take

any meaningful action that was reasonably calculated to end such abuse or to otherwise investigate the matter. Consequently, the University failed to meet its obligations and violated Title IX.

15.     Among other things, despite having the ability and authority to do so, the Department of Housing failed to contact Lauren with regard to the allegations of harassment, stalking or the other warning signs of potential abuse, it failed to otherwise investigate the matter or gather more information, it failed to contact Lauren and provide her with safety options and resources, it failed to contact or coordinate with other University departments or organizations, it failed to take action required by University of Utah policies and procedures and it otherwise failed to take any meaningful action to address the situation and ultimately prevent Lauren's murder.

16.     Similarly, despite having actual knowledge that Melvin Rowland was harassing Lauren and stalking her, despite receiving other information sufficient to alert the University to the possibility that Lauren was otherwise a victim of domestic violence and dating violence and despite having actual knowledge that Melvin Rowland had committed or attempted to commit several other crimes that would be considered sexual harassment and sexual discrimination under Title IX, the University Department of Public Safety ("UUPS") acted with deliberate indifference and conscious disregard of the deadly situation, and thus failed to take any meaningful action that was reasonably calculated to end such abuse or to otherwise investigate the matter. Consequently, the University failed to meet its obligations and violated Title IX.

17.     Among other things, despite having the ability and authority to do, UUPS failed to investigate whether Melvin Rowland was on parole, failed to attempt to make contact

with Melvin Rowland or with anyone who might have information about him, failed to make any attempt to determine whether Melvin Rowland was behind the harassment and extortion, failed to acknowledge that Melvin Rowland had committed or attempted to commit crimes in addition to the extortion, failed to use any reasonable means to protect Lauren, failed to formulate or implement any plan to prevent further abuse and failed to describe the rights and remedies available to Lauren as required under the Cohabitant Abuse Act.  In fact, rather than investigating the allegations against Lauren and treating them with the urgency that they deserved, the detective in charge of Lauren's case went on vacation and returned to find that Lauren had been murdered.  Despite the fact that the detective instructed Lauren to send her information, none of the information that Lauren sent was forwarded to an officer or detective who was on-duty.

18.     Based on this lack of action by either the Department of Housing or UUPS, the University of Utah clearly failed to adequately train its employees to recognize the warning signs of abusive behavior.

19.     Upon information and belief, the University of Utah's failure to investigate or take any meaningful action was based on irrational gender stereotypes.  In fact, the Department of Housing dismissed its obligation to take any action based on the fact that Lauren was in a consensual relationship and would want "privacy" in the matter. Thus, the Department of Housing only considered threatening Lauren with guest policy violations for allowing Melvin Rowland to stay in her dormitory, thereby suggesting that Lauren, like most women, likely encouraged and provoked the abuse and that she was to blame for the abuse and the circumstances that led to it.  Additionally, despite the fact that Lauren contacted UUPS more

than 20 times to report her concerns about Melvin Rowlands's abusive and criminal behavior, UUPS refused to respond to the reports based on the assumption that Lauren, like most women, was unreasonable, hysterical, hypersensitive, paranoid, overreacting to the situation and not being truthful. UUPS refused to believe that Melvin Rowland was the culprit and failed to investigate the matter to determine whether Melvin Rowland was in fact the culprit based on the assumption that Lauren, like most women, was reporting the abuse out of spite or because she had ulterior motives. In basing its decision on these gender stereotypes and others, the University of Utah violated Lauren's clearly established right to equal protection under the Fourteenth Amendment of the United States Constitution.

20.     Despite doing everything within her power to get the University to take action, on October 22, 2018, Melvin Rowland hunted Lauren down on campus as she was returning from class. He grabbed her, dragged her across a parking lot and shoved her into a car that he had borrowed. At the time of the attack, Lauren was on the phone with her mother and father, Jill and Matthew McCluskey, who heard her cries for help and immediately alerted law enforcement. Melvin Rowland then shot Lauren over and over – seven times total – he then called a woman that he just met online, invited her to dinner and later showered at her apartment. Later that night when the police attempted to apprehend him, he fled, broke into a church and ultimately committed suicide.

### PARTIES, JURISDICTION AND VENUE

21.     Plaintiff Lauren McCluskey, now deceased, was at all times pertinent hereto a resident of Salt Lake City, Salt Lake County, State of Utah.

22.     Plaintiff Jill McCluskey is and was at all times pertinent hereto a resident of Pullman, Whitman County, Washington and was the natural parent of Plaintiff Lauren McCluskey.

23.     Plaintiff Matthew McCluskey is and was at all times pertinent hereto a resident of Pullman, Whitman County, Washington and was the natural parent of Plaintiff Lauren McCluskey.

24.     Defendant State of Utah (including the University of Utah, University Department of Housing and Residential Education ("Department of Housing") and University Department of Public Safety ("UUPS")) (collectively the "University") is and was at all times pertinent hereto, a government entity as defined by Utah Code §63G-7-102(4) and a public university with its principal place of business in Salt Lake City, Salt Lake County, State of Utah, where it resides.

25.     Defendant Dale Brophy is and was at all times pertinent hereto, the UUPS Chief of Police and an employee and/or agent of the University who, upon information and belief, resides in Salt Lake City, Salt Lake County, State of Utah.

26.     Defendant Kory Newbold is and was at all times pertinent hereto, a Sergeant with UUPS and an employee and/or agent of the University who, upon information and belief, resides in Salt Lake City, Salt Lake County, State of Utah.

27.     Defendant Kayla Dallof is and was at all times pertinent hereto, a Detective with UUPS and an employee and/or agent of the University who, upon information and belief, resides in Salt Lake City, Salt Lake County, State of Utah.

28.     Defendant Miguel Deras is and was at all times pertinent hereto, an Officer with UUPS and an employee and/or agent of the University who, upon information and belief, resides in Salt Lake City, Salt Lake County, State of Utah.

29.     Defendant Todd Justensen is and was at all times pertinent hereto, the Associate Director Leadership Team ("ADLT") with the Department of Housing and an employee and/or agent of the University who, upon information and belief, resides in Salt Lake City, Salt Lake County, State of Utah.

30.     Defendant Heather McCarthy is and was at all times pertinent hereto, the Area Coordinator ("AC") with the Department of Housing and an employee and/or agent of the University who, upon information and belief, resides in Salt Lake City, Salt Lake County, State of Utah.

31.     Defendant Emily Thompson is and was at all times pertinent hereto, the Resident Director ("RD") with the Department of Housing and an employee and/or agent of the University who, upon information and belief, resides in Salt Lake City, Salt Lake County, State of Utah.

32.     Upon information and belief, Defendants Jane/John Does are and were at all times pertinent hereto, employees and/or agents of the University who reside in Salt Lake City, Salt Lake County, State of Utah.

33.     The injuries giving rise to this Complaint occurred on the University of Utah campus in Salt Lake City, Salt Lake County, State of Utah.

34.     This action arises, in part, under Title IX of the Education Amendments of 1972 20 U.S.C. §§1681, *et seq*. and accordingly, this Court has original subject matter jurisdiction under 28 U.S.C. §1331.

35.     This action also arises, in part, under 42 U.S.C. §1983 and accordingly, this Court has original subject matter jurisdiction under 28 U.S.C.§1343(a)(3) and (4).

36.     Because Defendants reside in this district and because a substantial part of the events or omissions giving rise to the claims occurred in this district, venue is appropriate in this district pursuant to 28 U.S.C. §1392(b).

## FACTUAL ALLEGATIONS

37.     Plaintiffs incorporate by this reference all previous paragraphs above as though fully set forth below.

38.     In 2018, Plaintiff Lauren McCluskey ("Lauren") was a 21-year-old senior at the University of Utah where she was a successful student and track athlete.

39.     Originally from Pullman, Washington, at all times pertinent hereto, Lauren lived on the University of Utah campus at the Shoreline dormitory, which is supervised and managed by the University of Utah Department of Housing and Residential Education ("Department of Housing").

### *Melvin Rowland's Escalating Pattern of Dating Violence, Domestic Violence, Stalking, Sexual Harassment and Abuse Against Lauren McCluskey*

40.     On or about September 3, 2018, Lauren met Melvin Rowland, a 37 year-old felon, sex offender, con man and master manipulator who was on parole after serving over a decade in prison.  He had convinced Lauren and others that he was a 28 year-old student named "Shawn Fields" who was studying computer science at a community college and working part-time in security.  Significantly, Melvin Rowland was over six feet tall, weighed approximately 250 pounds and was a large, powerful and intimidating individual who worked as a bouncer at a local night club.

41.     On or about September 10, 2018, Lauren began to date Melvin Rowland and concern amongst Lauren's friends began to develop almost immediately.

42.     Indeed, among other things, Lauren's friends noticed that Melvin Rowland was possessive, controlling and manipulative.  For instance, Melvin Rowland routinely told Lauren what to wear, he would go through Lauren's text messages and emails and he would often accuse her of lying and betrayal, which is common tactic employed by abusers.  Furthermore, Melvin Rowland would not allow Lauren to go to social events or associate with her friends without him present because he was jealous and possessive.  Melvin Rowland would often start telephone conversations with a hostile quiz demanding that Lauren explain what she was doing, where she was and who she was with.

43.     Melvin Rowland also stalked Lauren by observing her from afar when they were not together.   In fact, Melvin Rowland told Lauren he was stalking her in order to scare her into thinking that he could be watching her at any given moment.  He used this control tactic to ensure that Lauren also would provide honest responses when he quizzed her on her whereabouts and activities.  Melvin Rowland often became enraged to yell at Lauren and accuse her of being unfaithful if she did not answer his calls immediately or if she was late meeting him.  This left Lauren frantic when Melvin Rowland would call and in a panic before meeting with him, fearful that she might ignite his anger somehow.

44.     Melvin Rowland also demanded that Lauren pick him up at work when his shift ended at 2:00 a.m. and he frequently borrowed Lauren's car while effectively living with Lauren at her dormitory on the University's campus.  Melvin Rowland expected Lauren to run his errands, buy him gifts, cook and clean for him.  Melvin Rowland demanded sex from Lauren and

14

manipulated her into doing things that were inconsistent with her personality and character. Indeed, Melvin Rowland would get upset when Lauren wanted to attend church on Sundays – something that she had done consistently her whole life.

45.     After dating Melvin Rowland for a couple of weeks, Lauren's friends noticed changes in her affect and appearance.  Lauren had lost weight, she looked exhausted and stressed out, her eyes were glassy and hollow, she stopped wearing makeup, she was not taking care of herself, she was not paying attention to her studies, she was not eating well, her enthusiastic demeanor disappeared and she seemed depressed and defeated.  Most concerning of all, Lauren's friends noticed bruising on Lauren's body.

46.     On or about September 23, 2018, in violation of his parole agreement, and despite the fact that he was a "Category I restricted person" who had been previously convicted of a "violent felony," Melvin Rowland took Lauren to shoot guns with his friends.

*47.*     On or about September 26, 2018, Lauren called her close friend and fellow student, Alexandria Mumphery, expressing sadness and frustration with Melvin Rowland's controlling behavior.  During that call, Lauren mentioned that Melvin Rowland was getting her a gun sometime in the very near future so that she could protect herself against advances from other men.  Already concerned by Melvin Rowland's behaviors toward Lauren and after noticing striking changes in Lauren's appearance, demeanor and personality develop over the course of a very short period of time, Alexandria was alarmed when she heard that Melvin Rowland would be getting a gun for Lauren.  Accordingly, Alexandria consulted two more of Lauren's close friends and fellow students, Alejandra Sanchez and her sister, Carmen Sanchez.  Alejandra and

Carmen had observed the same behavior and had the same concerns as Alexandria, which were significantly enhanced when they too learned about the gun.

*Actual Notice to the University that Melvin Rowland was Committing Dating Violence, Domestic Violence, Stalking, Sexual Harassment, and Other Abuse against Lauren McCluskey*

48.     In fact, their concerns were so great that, on September 30, 2018, Lauren's friends sent Alejandra to seek help from the Graduate Assistant ("GA") for Shoreline dormitory, Diamond Jackson ("Jackson").  Significantly, GA Jackson, Alejandra and Carmen were close friends and GA Jackson knew both Lauren and Alexandria personally.

49.     Alejandra told GA Jackson that she had spoken with Alexandria and what they had spoken about, specifically indicating that they were both very worried about Lauren.  Among other things, Alejandra told GA Jackson that Lauren was in an unhealthy and potentially harmful relationship with an older man who was possessive, controlling and manipulative.  She told GA Jackson about Melvin Rowland's delusions of infidelity, his jealous rages and his hostile quizzes, providing specific examples and anecdotes.  She told GA Jackson about the changes in Lauren's personality and appearance and how Lauren had stopped taking care of herself. Moreover, Alejandra reported unexplained bruises on Lauren's body, which indicated physical abuse.

50.     Among other things, Alejandra told GA Jackson that Melvin Rowland had been stalking Lauren and that Melvin Rowland made Alejandra feel very uncomfortable.  Indeed, Alejandra told GA Jackson she was afraid that Melvin Rowland was stalking her as well by tracking her whereabouts when she was with Lauren.

16

51.     Alejandra also told GA Jackson that Melvin Rowland had access to compromising images of Lauren and that she was concerned that Melvin Rowland might use them to exploit Lauren.

52.     Alejandra also told GA Jackson that Melvin Rowland had practically been living on campus at Lauren's dormitory and that he was planning to get Lauren a gun to keep with her. Indeed, Alejandra told GA Jackson that *she feared for Lauren's life* after observing several indicators of an abusive relationship and after learning that Melvin Rowland had access to a gun that could enter the picture sometime in the very near future.

53.     Accordingly, on September 30, 2018, GA Jackson called the Resident Director ("RD"), Emily Thompson ("Thompson"), to pass Alejandra's report to the appropriate officials. At that time, GA Jackson assumed the University would remove Melvin Rowland from campus, as that was within its authority and he was a non-student.  However, RD Thompson was new to her position and was not sure what to do about the situation.

54.     That same day, GA Jackson also called the Area Coordinator ("AC"), Heather McCarthy ("McCarthy"), to provide the same report.  During this call, GA Jackson offered to go directly to Lauren's dormitory, to immediately investigate the situation and to call UUPS.  AC McCarthy prohibited GA Jackson from taking these actions to instead claim that GA Jackson's concerns were speculative and that the University needed to respect Lauren's privacy – thereby perpetuating a dangerous myth about intimate partner violence.  Upon GA Jackson's urging, AC McCarthy agreed to revisit the matter the next day at an area meeting.

55.     At the area meeting on October 1, 2018, GA Jackson provided more detail to AC McCarthy and to RD Thompson regarding the report concerning Lauren.  Among other things,

GA Jackson told AC McCarthy and RD Thompson that Melvin Rowland had isolated Lauren, that Melvin Rowland would aggressively demand to know her whereabouts at all times and that Lauren was terrified of angering him – all classic signs of dating violence and domestic violence readily identifiable by trained officials. GA Jackson also told AC McCarthy and RD Thompson that Lauren was in danger of being sexually exploited and harassed given Melvin Rowland's possession of compromising images.

56.    GA Jackson also told AC McCarthy and RD Thomson that Melvin Rowland had been stalking Lauren, tracking her whereabouts and using this information to manipulate and control Lauren. In fact, GA Jackson told AC McCarthy and RD Thompson that Alejandra also feared that Melvin Rowland was stalking her and keeping tabs on her when she was around Lauren.

57.    Additionally, GA Jackson told AC McCarthy and RD Thomson that Lauren was acting out of character, that she was exhausted most of the time, that her demeanor had changed, that she was not taking care of herself or eating right and that she had unexplained bruises on her body, which indicated physical abuse.

58.    Finally, GA Jackson told AC McCarthy and RD Thompson that Melvin Rowland had been living with Lauren at the Shoreline dormitory and that he planned to acquire a gun to keep with her on campus, which indicated an escalating pattern of violence and risk.

59.    In response to the information that they had obtained from GA Jackson at the area meeting, AC McCarthy and RD Thompson claimed that there was nothing that the University could do about the situation due to privacy concerns and thus suggested waiting until Lauren reached out for help. GA Jackson objected to waiting, so AC McCarthy and RD Thompson

placated her by claiming that they would review the situation with Associate Director Leadership Team ("ADLT"), Todd Justensen ("Justensen").  McCarthy and RD Thompson also said that they would consider follow up with regard to the guest policy and counseling with regard to the implications of possessing a firearm on campus.  AC McCarthy and RA Thompson then asked GA Jackson to "keep an eye" on Lauren and to initiate an electronic CARE referral so that the CARE team could discuss Lauren's situation at the upcoming CARE meeting, which was scheduled for October 8, 2018.

60.     This proposed course of action was clearly unreasonable in the light of the known circumstances as it in no way addressed the dating violence, domestic violence, sexual harassment, stalking and other abuses by Melvin Rowland, who was a non-student continuing to freely access campus to commit these crimes and abuse against Lauren without any efforts by the University to stop him.

61.     Upon information and belief, technical difficulties prevented GA Jackson from submitting a CARE referral, so she sent AC McCarthy an email instead on October 2, 2018.

62.     Sometime thereafter, upon information and belief, AC McCarthy shared the information that she had learned about Lauren's situation to ADLT Justensen and the Assistant Director of Residential Education ("ADRE"); however, no action was taken and only empty promises were made indicating that the University would "keep Lauren on their radar."

63.     The Department of Housing did not keep Lauren on its radar, and neither AC McCarthy nor RD Thompson followed up with Lauren regarding the guest policy or the implications associated with possessing a firearm on campus.  Indeed, no University officials followed up with Lauren in any regard.

*Melvin Rowland Escalates his Dating Violence, Domestic Violence, Stalking,*
*Sexual Harassment and Abuse of Lauren McCluskey*

64.     Sometime between October 3 and October 4, 2018, Lauren discovered that

Melvin Rowland had been using a fake name and that he had lied about his age.  Lauren

confronted Melvin Rowland with the information that she had discovered and learned that

Melvin Rowland had many identities.  Upset and afraid, Lauren immediately left the campus for

Washington State to visit her family during fall break on October 5, 2018.

65.     From October 3 through October 8, 2018, AC McCarthy and RD Thompson met

with the Assistant Director for Conduct Management ("ADCM") and other Housing Department

officials to conduct various reviews.  Again failing to act upon a third party's report of dating

violence, these officials took no action to protect or otherwise assist Lauren, or even investigate

or pass the report to campus security or law enforcement.

66.     Additionally, on October 8, 2018, the Department of Housing cancelled a

previously scheduled CARE meeting intended to address Lauren's situation and to develop a

follow-up plan.  Accordingly, the University and its officials failed to develop any follow-up

plan and no further action was taken despite the ongoing risk to Lauren's safety.  Indeed, no

University official or representative kept an eye on Lauren or successfully reached out to Lauren

to see if she needed help, nobody confronted Lauren about the guest policy so that Melvin

Rowland could be removed from the dormitory and from campus, nobody counseled Lauren with

respect to the implications of having a gun on campus so that Melvin Rowland would not have

easy access to a gun on campus and nobody otherwise investigated the reports of stalking,

harassment or other potential acts of domestic violence and dating violence, which were strongly

indicated by the multitude of common warning signs, to ensure Lauren's safety and well-being.

Finally, nobody from the Department of Housing ever contacted the University's Department of Public Safety ("UUPS") to report that Melvin Rowland was stalking, sexually harassing and possibly also physically abusing Lauren as part of an escalating pattern of dating violence and domestic violence and that he intended to bring a gun on campus.

67.     Indeed, upon information and belief, the Department of Housing had a policy of calling UUPS only as an absolute last resort, even in a dangerous situation, because UUPS had a reputation for rarely responding to calls for assistance and, even when officers did respond, they were often unhelpful and their tactics were routinely counterproductive.

68.     Understandably suspicious after discovering that Melvin Rowland had lied about his name and age, Lauren and her friend, Regina Snyder, investigated the matter while in Washington State on fall break.  After performing a cursory search for Melvin Rowland's name on the internet, Lauren and Regina were horrified to discover that Melvin Rowland was a violent felon and convicted sex offender.  Realizing that she needed to end her relationship with Melvin Rowland immediately, but afraid that he would react violently, Lauren consulted Alexandria, who advised her to break off the relationship in a public place for safety purposes.  Alexandria updated Alejandra and Carmen, who were also away on fall break.

69.     Lauren returned to campus on October 9, 2018, with a plan to break off the relationship with Melvin Rowland in a public place.  While waiting for him to arrive, Lauren was talking to Alexandria on the telephone and she became both started and frightened when she observed Melvin Rowland peering through her window.  Accordingly, Lauren opened the door and confronted Melvin Rowland, intending to end the relationship then and there.  However, Melvin Rowland entered Lauren's room without permission and demanded to know who Lauren

21

had been speaking with on the telephone.  He effectively held Lauren hostage in her dorm room by refusing to leave and aggressively choosing to stay through the night.  During that time, Melvin Rowland tried to manipulate Lauren by claiming he had not committed the crime for which he was convicted and that he had been set up.

70.     Fearing for Lauren's safety, Alexandria tried to stay in contact with Lauren by telephone through the night.  According to Alexandria, Lauren sounded scared and could not speak openly because Melvin Rowland would only allow her to use the telephone when he was present to control her.  In an attempt to get Melvin Rowland to leave peacefully the next day, Lauren lied, told Melvin Rowland that she needed to go to track practice and offered him her car to run some errands.

71.     Later that evening, Lauren received text messages, purportedly from Melvin Rowland's friends (which she suspected were most likely from Melvin Rowland himself), telling Lauren that she had broken Melvin Rowland's heart, indicating that Melvin Rowland knew she had lied about going to track practice and offering to return Lauren's car on Melvin Rowland's behalf.  Among other things, the text messages were harassing, threatening and abusive, saying: "Hey Bitch your car is @ Stadium Key in passenger seat on floor.  This was only a favor for Sean.  He never told you he is in the Military reserves like us.  Good luck idiot!" and "Go kill yourself."

72.     Through information and belief, Melvin Rowland's electronic communications with Lauren originated on or within the immediate vicinity of the University of Utah campus, concerned events occurring on campus and specifically targeted a student living on campus.

73.     Through information and belief, Melvin Rowland used the University of Utah's wireless network in communicating electronically with Lauren.

74.     On October 10, 2018, Melvin Rowland called Lauren offering to return her car in person.  Afraid that Melvin Rowland was trying to lure her to an isolated area and fearing for her safety, Lauren called her mother, Jill McCluskey ("Mrs. McCluskey") who in turn called UUPS. Mrs. McCluskey, who was very upset and worried, explained the circumstances, told UUPS that Melvin Rowland was a sex offender and requested a police escort to help Lauren safely recover her car from Melvin Rowland.  UUPS transferred Mrs. McCluskey to campus security, who arranged and provided a security escort, and Lauren retrieved her car without incident, but neither UUPS nor any other official from the University provided any follow-up to address the pattern of stalking, harassment, domestic violence, dating violence or the ongoing and escalating risk to Lauren.

75.     On October 11, 2018, Lauren received more text messages, purportedly from Melvin Rowland's friends (which she suspected were most likely from Melvin Rowland himself), indicating that Melvin Rowland was suicidal, that he had been in an accident, that it was Lauren's fault and that Lauren consequently needed to visit Melvin Rowland in the hospital. Later, Lauren received more text messages indicating that Melvin Rowland had died and that Lauren needed to go to the funeral.  In response, Lauren stated that the police were involved and to stop contacting her.

76.     Early in the morning on October 12, 2018, Lauren received more harassing text messages, purportedly from Melvin Rowland's friends (which she suspected were most likely from Melvin Rowland himself), indicating that "Shawn is gone because of you! Don't come to

his funeral.  We had his phone texting you.  Cold Bitch."  Again, Lauren responded by saying "Please don't contact this number.  I got police involved."  Lauren then received a response saying: "So do we."

### *UUPS Continued to Act with Deliberate Indifference when Melvin Rowland Escalated his Criminal Conduct to Murder Lauren*

77.     Suspicious that the text messages that she received on October 11 and 12, 2018 were another attempt to lure her away from campus into a trap, Lauren called UUPS and reported her concerns regarding the harassing text messages on October 12, 2018.

78.     In response, UUPS acted with deliberate indifference by claiming there was nothing that they could do to help and advising her to contact UUPS only if the situation escalated, thereby ignoring Lauren's report of stalking, dating violence, domestic violence, sexual harassment, and ongoing efforts to potentially lure her into a harmful situation.

79.     On October 13, 2018, Lauren contacted UUPS by telephone again to speak to an officer with regard to the report that she had filed on October 12, 2018.  Lauren explained that the text messages that she had received on October 11 and October 12, 2018 were in fact sent by Melvin Rowland rather than by Melvin Rowland's friends, thereby indicating that Melvin Rowland was stalking her, harassing her and attempting to lure and potentially hurt her.  Lauren also reported that Melvin Rowland had extorted her and that she had paid Melvin $1,000 that same morning after he had threatened to publish and distribute a compromising image of Lauren, which he had obtained without her permission during the course of their relationship and which he used to control her as part of his pattern of dating violence, domestic violence, sexual harassment, and stalking.  Lauren also told UUPS that Melvin Rowland was demanding another

24

$1,000 to refrain from distributing another embarrassing and exploitive image that he claimed to have.

80.     Fearing that her reports were not being taken seriously, Lauren then went with Alexandria to the UUPS building in person on the morning of October 13, 2018 where they spoke with, among others, Officer Miguel Deras.  Despite the fact that UUPS has several private rooms where they can discuss sensitive matters, the officers stood in front of Lauren and Alexandria and interviewed them as they sat in the lobby of the station, demonstrating a complete disregard for the seriousness of the situation.  During the interview, both Lauren and Alexandria described the circumstances in some detail, telling UUPS how Melvin Rowland had lied about his name and age, how they had discovered that Melvin Rowland was a felon and convicted sex offender, how Melvin Rowland had scared Lauren by peeping through her window, how Lauren had ended her relationship with Melvin Rowland, how Melvin Rowland had been stalking and harassing Lauren since the breakup, how Melvin Rowland had access to a gun, how Melvin Rowland had successfully extorted Lauren by causing her to pay him $1000 not to distribute a compromising image and how he was currently attempting to extort Lauren again by seeking an additional $1000 not to distribute another compromising image.  Lauren also provided evidence in the form of text messages and receipts indicating that she had in fact been extorted and she insisted that Melvin Rowland was the culprit.

81.     UUPS officers ignored Lauren's report of stalking and sexual harassment and ignored the warning signs and patterns of domestic violence and dating violence by dismissing evidence that Melvin Rowland had extorted Lauren with no investigation into the matter and suggesting instead that Lauren was the victim of an online scam.  UUPS also ignored the

information indicating that Melvin Rowland was a "Category I restricted person" who was prohibited from possessing a gun or from even making arrangements to have a gun under his custody or control.

82.     Despite the fact that Melvin Rowland was not a student at the University of Utah, UUPS ran a check on Melvin Rowland's name in the University student database, incorrectly obtaining a report on a student with a similar name and wrongly concluding that Melvin Rowland "seems like a good guy."  Again fearing that their reports were not being taken seriously, Alexandria did a Google search, which immediately provided information to UUPS that Melvin Rowland was a convicted felon and sex offender.

83.     Accordingly, UUPS ran a criminal history check for Melvin Rowland and discovered his history of felony convictions, but failed to notice and/or obtain information regarding his supervisory status or information that would have otherwise indicated whether Melvin Rowland was currently on parole.  This information would have allowed UUPS to take action by reporting parole violations and provided additional reasons to detain Melvin Rowland and arrest him.

84.     Despite the fact that Lauren was the victim of the crime rather than a witness to the crime, the officers asked Lauren to complete a witness statement.  Through information and belief, Lauren indicated that Melvin Rowland had access to a gun in her witness statement – key information indicating the serious risk to the campus community by Melvin Rowland's ongoing presence.  As she was completing the witness statement and attempting to provide thorough and complete information, the officers rushed Lauren to finish up, telling her that they were only concerned about the extortion and that she could just leave everything else about the stalking,

harassment, domestic violence and dating violence out of the statement.  As Lauren and

Alexandria were leaving, the officers told them that they would follow up by October 16, 2018.

The officers then contacted the on call detective, Kayla Dallof, who asked the officers to forward

the file and to obtain more information about the concerns.  Lauren provided additional

information about the extortion to UUPS later that afternoon, along with a message indicating

that she was being threatened and blackmailed.  Detective Dallof notified Detective Sergeant

Kory Newbold of the investigation.

85.     Based on the reports alleging stalking, harassment and other crimes that qualified

as domestic violence and dating violence, UUPS was required by law to, among other things,

"use all reasonable means to protect the victim and prevent further violence" and to "arrange,

facilitate, or provide the victim with immediate and adequate notice of the rights of victims and

of the remedies and services available to victims of domestic violence," including but not limited

to information sufficient to obtain an order of protection or a stalking injunction from the courts.

Utah Code § 77-36-2.1; see also Utah Code § 76-5-106.5(17); see also 78B-7-408.  However,

UUPS did nothing to protect Lauren or to prevent further violence.  Moreover, UUPS failed to

arrange, facilitate or provide any notice to Lauren of her rights as a victim or of the remedies and

services that were available to her.

86.     Still concerned that UUPS was not taking her reports seriously, Lauren called the

Salt Lake City Police Department ("SLCPD") later in the evening on October 13, 2018 to report

her concerns regarding Melvin Rowland and her concern that UUPS had taken no action in

response to her criminal complaint, but SLCPD merely transferred Lauren back to UUPS, who

told her that her assigned officer would follow up.

87.     On October 15, 2018, Lauren tried to contact UUPS, but no one at UUPS expressed any familiarity with her case.

88.     That same day, GA Jackson received an update from Alejandra and Carmen, who had just returned from fall break.  Alejandra and Carmen told GA Jackson that Melvin Rowland had lied about his name and his age, that he was a convicted felon and sex offender, they told her about the break-up, about the incident where Lauren needed a security escort to recover her car, about the harassing text messages and about how the police were now involved.  Alejandra and Carmen continued to give GA Jackson frequent updates in the days that followed and during a subsequent conversation, they told GA Jackson that Melvin Rowland had extorted Lauren.

89.     Despite instructing GA Jackson to "keep an eye" on Lauren, nobody from the Department of Housing ever followed up with GA Jackson or with anyone else to get an update. Furthermore, GA Jackson did not share any of the updated information that she had received with the Department of Housing or its officials because she mistakenly believed that there was nothing that the University could do about the situation based on the Department of Housing's initial dismissive response.

90.     On October 16, 2018, Lauren expected UUPS to follow up and provide an update as promised, but nobody contacted Lauren.  Indeed, from October 16 through October 19, 2018, UUPS did nothing to investigate and took no action with regard to Lauren's case even though Lauren continued to send information to UUPS about her concerns during that period of time.

91.     On October 19, 2018, Lauren started receiving text messages indicating that Melvin Rowland knew about her contact with the police and Lauren feared that an insider at UUPS had been secretly leaking information to him.  Among other things, the text messages

said: "What did you tell the cops?" "We know everything!" and "Setting up people wasn't

enough.  Your Sex Offender ex-boyfriend.  It will go viral today!"

92.     Accordingly, on October 19, 2018, Lauren called SLCPD again concerned that

UUPS had not followed up regarding her case.  Lauren also expressed concern that a potential

insider at UUPS had been providing information to Melvin Rowland.  SLCPD then told Lauren

to contact UUPS and to speak with the detective in charge of her case.

93.     Accordingly, Lauren contacted UUPS as SLCPD had advised her to do on

October 19, 2018.  She told UUPS that Melvin Rowland knew about her contact with the police

– clearly indicating that Melvin Rowland had been monitoring Lauren and her communications

and continuing to stalk her.  Lauren also told UUPS that her parents were worried about her,

hoping that the information would cause them to take her case more seriously.  In response,

Detective Dallof informed Lauren that she was out of the office on vacation, but would be back

to follow-up on October 23, 2018.  Detective Dallof also told Lauren to forward all

communications from Melvin Rowland in the meantime and to contact UUPS if she received any

communications that appeared to be an attempt to lure her somewhere.  Among other things,

Lauren sent Detective Dallof an email with a screen shot indicating that Melvin Rowland was

aware of her attempt to involve the police.  On October 20, 2019, Lauren sent Detective Dallof

more information regarding Melvin Rowland's criminal history and offender details.

94.     On October 22, 2018, Lauren received a text message, purportedly from the

deputy chief of UUPS, which said: "Good Morning Lauren this is Deputy Chief Mclenon with

the University Police.  I plan on calling you but I'm in a meeting at the moment.  Can you come

to the station as soon as possingle [sic] there is something you need to see.  I will go over the

detail when we you [sic] get here.  Thanks."  Recognizing the text message as a potential attempt by Melvin Rowland to lure her away from her dormitory, Lauren called UUPS to speak with Officer Deras.  She left messages three times over a two-hour period until he finally called her back and she forwarded a screen shot of the text message via email to Detective Dallof.  Officer Deras identified the text message as a fake and told Lauren not to respond, but UUPS otherwise did not investigate the matter and took no action in response to this violent felon and sex offender's attempts to lure Lauren away from her dormatory by impersonating a police officer.

95.     Indeed, despite instructing Lauren to send information to her email, Detective Dallof failed to check her email and did not receive Lauren's report indicating that Melvin Rowland had attempted to lure her away from her dormitory by impersonating a police officer and thus UUPS took no meaningful action despite this serious situation.

96.     On October 22, 2018, the Department of Housing finally held a CARE meeting to discuss Lauren's situation, but nobody at the meeting had investigated the matter, therefore nobody had any additional information about recent events and, as a result, no action was taken by the University or its officials.  Indeed, the Department of Housing had not invited GA Jackson to participate in the CARE meeting.  Moreover, despite asking GA Jackson to "keep an eye" on Lauren, nobody from the Department of Housing contacted GA Jackson to see what she had learned or to see whether GA Jackson had acquired additional information about the situation.

97.     Later in the evening on October 22, 2018, Melvin Rowland stalked Lauren, hunted her down on the University campus and attacked her as she was returning from class and talking to her mother, Jill McCluskey, on the telephone.  Both Mrs. McCluskey and Mr. McCluskey heard Lauren shout "No! No! No! No!" as a struggle ensued.  Terrified, Mr.

McCluskey called 911 to express his fear that Melvin Rowland had kidnapped Lauren and was transferred to UUPS.  In fact, Melvin Rowland had grabbed Lauren, forced her into a car that he had borrowed from a friend, shot her seven times and left her to die.  Melvin Rowland then called another woman who came to pick him up, took him out to dinner and took him back to her home where he took a shower.

98.     That night, UUPS finally investigated Melvin Rowland and discovered that he was on parole, that he had multiple telephone numbers, that his telephone numbers had been used to harass and extort Lauren, that he had borrowed a gun and a car and that he was expecting the police to arrest him for extorting Lauren.  When UUPS located Melvin Rowland using his telephone, he ran and they pursued him into a church near the University where he committed suicide by shooting himself in the head.

99.     Based on the explicit and detailed reports that it had received from Lauren and her friends, the University had actual knowledge that Melvin Rowland was a substantial risk to Lauren and other students on campus.

100.     The University also had general knowledge of a serious and obvious risk of sexual harassment and domestic violence on its campus, but was deliberately indifferent to the need to implement policies and programs to address the risk.

*The University's Known Policy and Practice of Sex Discrimination*

101.     Moreover, the University has an official policy or custom of treating women differently based on irrational gender stereotypes, of acquiescing in sexual harassment, of failing to believe women who report sexual harassment, of failing to investigate or otherwise respond reasonably to reports of sexual harassment against women, of being deliberately indifferent to

reports of sexual harassment against women, of otherwise failing to take reports of sexual harassment against women seriously and of failing to implement appropriate policies and procedures intended to manage issues relating to sexual harassment.

102.    For example, on one occasion, UUPS failed to investigate or respond in a timely or appropriate manner to a woman who reported that her boss at the University Hospital had raped her on two separate occasions because UUPS refused to believe the woman's report.

103.    On another occasion, UUPS failed to investigate or respond in a timely or appropriate manner to reports of a peeping tom on campus even after the peeping tom sexually assaulted another woman on campus three hours after the initial report of peeping.  When the peeping tom sexually assaulted another woman shortly thereafter, UUPS failed to respond for 20 minutes despite having the ability to respond within 90 seconds, demonstrating its utter disregard for the seriousness of gender violence.

104.    Not only did UUPS disregard gender violence, its officers directly engaged in sex and gender-based harassment and discrimination. For example, on information and belief, UUPS officers are known for urinating in the locker and patrol bag of a woman officer, using demeaning and derogatory language when referring to women and refusing to respond to internal reports of sexual harassment within UUPS.

105.    Defendants' acts or omissions were the result of willful and malicious conduct or conduct that manifested a knowing and reckless indifference toward, and a disregard of, Lauren's rights and were a cause of the injuries suffered and damages incurred by the Plaintiffs.

### FIRST CAUSE OF ACTION
### (DELIBERATE INDIFFERENCE UNDER TITLE IX)

106.    Plaintiffs incorporate by this reference all previous paragraphs above as though fully set forth below.

107.    The University of Utah receives federal funding and is therefore subject to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX").

108.    The University, through its Department of Housing and through UUPS, had "actual knowledge" that Melvin Rowland was stalking, sexually harassing, abusing, intimidating and otherwise harming and threatening Lauren on the basis of her sex and information sufficient to alert the University to the possibility that Lauren was a victim of dating violence and domestic violence.

109.    The vast majority of stalking, abuse, intimidation, domestic violence, dating violence, sexual harassment and other abuse occurred on campus under the operation of the University's programs, including but not limited to the University's housing programs.

110.    Actual knowledge of the stalking, abuse, intimidation, domestic violence, dating violence, sexual harassment and gender based discrimination at issue was obtained by the appropriate persons at the University in the Department of Housing, including but not limited to the graduate assistant, GA Jackson, the resident director, RD Thompson, the area coordinator AC McCarthy, the assistant director of residential education, the associate director leadership team, ADLT Justensen, the assistant director for conduct management and other University officials at the Department of Housing.

111.    These officials individually and jointly exercised substantial control over activities occurring on the University campus and at the Shoreline dormitory and over people

such as Melvin Rowland, who are visiting the University campus and/or the Shoreline dormitory. Indeed, the University policies regarding sexual harassment extend to people who are visiting the University even though such persons may not be directly affiliated with the University. Accordingly, these officials had the authority and ability to take appropriate and timely remedial action to end the harassment by, among other things:

a. enforcing University policies and procedures;

b. investigating the allegations against Melvin Rowland;

c. banning Melvin Rowland from campus;

d. contacting and coordinating with UUPS;

e. contacting and coordinating with other University departments, organizations or teams, including but not limited to the CARE team and the Behavior Intervention Team ("BIT");

f. providing referrals to victim advocacy and/or counseling services;

g. providing housing adjustments;

h. providing academic adjustments;

i. imposing no-contact directives

j. providing security escorts;

k. providing other safety and protective measures;

l. providing educational training;

m. reviewing or revising University policies or practices; and/or

n. considering broader remedial action.

Despite this authority, the University took no action to constitute deliberate indifference and leave Lauren to be kidnapped and murdered on its campus.

112.   Moreover, actual knowledge of the stalking, abuse, intimidation, dating violence, domestic violence, sexual harassment and gender based discrimination at issue was obtained by the appropriate persons from the University at UUPS, including but not limited to various police officers, including Miguel Duras, detectives, including Kayla Dallof, sergeants, including Kory Newbold, the chief of police, Dale Brophy and/or other University officials at UUPS.

113.   These officials individually and jointly exercised substantial control over activities occurring on the University campus and at the Shoreline dormitory and over people such as Melvin Rowland, who are visiting the University campus and/or the Shoreline dormitory. Again, the University policies regarding sexual harassment extend to people who are visiting the University even though such persons may not be directly affiliated with the University. Accordingly, these officials had the authority and ability to take appropriate and timely remedial action to end the harassment by, among other things:

      a.      enforcing University policies and procedures;

      b.      investigating the allegations against Melvin Rowland;

      c.      contacting and coordinating with Melvin Rowland's parole officers;

      d.      detaining and or arresting Melvin Rowland for suspected criminal activity;

      e.      arranging, facilitating or providing immediate and adequate notice of the rights of victims and of the remedies and services available to victims of stalking and/or domestic violence, including but not limited to information

sufficient to obtain an order of protection or a stalking injunction from the courts;

f.     banning Melvin Rowland from campus;

g.     contacting and coordinating with the Department of Housing;

h.     contacting and coordinating with other University departments, organizations or teams, including but not limited to the CARE team and the BIT team;

i.     providing referrals to victim advocacy and/or counseling services;

j.     providing housing adjustments;

k.     providing academic adjustments;

l.     imposing no-contact directives

m.     providing security escorts;

n.     providing other safety and protective measures;

o.     providing educational training;

p.     reviewing or revising University policies or practices; and/or

q.     considering broader remedial action.

Despite this authority, the University took no action to constitute deliberate indifference and leave Lauren to be kidnapped and murdered on its campus.

114.    The University was deliberately indifferent to the ongoing stalking, abuse, intimidation, domestic violence, dating violence, sexual harassment and gender based discrimination occurring on its campus and specifically directed towards one of its female students and its response to the information that it had received about Lauren's situation was

clearly unreasonable in light of the known circumstances, ultimately resulting in Lauren's brutal murder.

115.    Indeed, despite having the ability and authority to do so, the University consciously failed to investigate the allegations against Melvin Rowland and deliberately failed to take any action that was reasonably calculated to end the stalking, abuse, intimidation, domestic violence, dating violence, sexual harassment or gender based discrimination, thereby exposing Lauren and making her more vulnerable to ongoing stalking, abuse, intimidation, domestic violence, dating violence, sexual harassment and gender based discrimination and creating a hostile educational environment in which Lauren felt unsafe and was in fact unsafe on campus, and which ultimately resulted in her brutal murder.

116.    The stalking, abuse, intimidation, domestic violence, dating violence, sexual harassment and gender based discrimination was so severe, pervasive and objectively offensive that it deprived Lauren of access to educational opportunities and benefits during her life and upon her murder.

117.    To the extent that University officials or other appropriate persons who had the ability and authority to take remedial action obtained knowledge within the course and scope of their employment or agency relationship with the University, such knowledge is imputed to the University and to other University officials or other appropriate persons at the University who had the ability and authority to take remedial action.

118.    The University is independently liable for action that it took or failed to take in light of the knowledge that was imputed to it through its officials or through the appropriate persons who had the ability and authority to take remedial action.

**SECOND CAUSE OF ACTION**
**(INDIVIDUAL LIABILITY – VIOLATION OF EQUAL PROTECTION**
**UNDER THE FOURTEENTH AMENDMENT – 42 U.S.C. § 1983)**

119.    Plaintiffs incorporate by this reference all previous paragraphs above as though fully set forth below.

120.    Individual Defendants had a duty to respond to reports of stalking, abuse, intimidation, domestic violence, dating violence, sexual harassment and gender based discrimination against Lauren.

121.    Individual Defendants exercised discretion at the moment when they decided how they would respond to reports that Melvin Rowland was sexually harassing Lauren.

122.    The duty to respond and the power to exercise discretion in determining how Individual Defendants would respond to reports that Melvin Rowland was stalking, abusing, intimidating, sexually harassing and discriminating against Lauren was possessed by virtue of state law and made possible only because state law vested Individual Defendants with the authority to respond to such reports.  Accordingly, Individual Defendants were acting under color of state law when they exercised discretion in determining how they would respond to reports that Melvin Rowland was stalking, abusing, intimidating, sexually harassing and discriminating against Lauren.

123.    In determining how to exercise their discretion in responding to reports that Melvin Rowland was stalking, abusing, intimidating, sexually harassing and discriminating against Lauren, through information and belief, Individual Defendants based their decisions on irrational gender stereotypes through the mechanical application of traditional, yet inaccurate, assumptions about the nature of men and women and their proper roles in society, including but

38

not limited to gender stereotypes indicating: that women are unreasonable, irrational, hysterical and hypersensitive; that women overreact to situations; that women are spiteful; that women report abuse or harassment to get attention; that women have ulterior motives when they report abuse or harassment; that women are often untruthful when they report abuse or harassment; that men often have a legitimate reason for abusing or harassing women; that women often deserve, encourage, provoke or enjoy the harassment or abuse that they report; that women who look or act a certain way are "tramps" or "sluts;" that women send mixed signals to men; that women cannot be trusted and that men are therefore justified in questioning their fidelity; that men cannot control their primal urges; that women have the power to end harassment or abuse on their own; that a woman who is being harassed or abused will always seek help on their own behalf; that women should be accommodating and subservient to men; that men have the right to exercise authority over women; and/or that women hate men and will take drastic measures cause them harm.

124.    Individual Defendants classified Lauren by her gender and engaged in differential treatment that violated Lauren's right to equal protection under the Fourteenth Amendment of the United States Constitution, thereby acquiescing in the stalking, abuse, intimidation, domestic violence, dating violence, sexual harassment and gender based discrimination, when they were deliberately indifferent to the reports that Melvin Rowland was stalking, abusing, intimidating, sexually harassing and discriminating against Lauren.

125.    Additionally or in the alternative, Individual Defendants classified Lauren by her gender and engaged in differential treatment that violated Lauren's right to equal protection under the Fourteenth Amendment of the United States Constitution, thereby acquiescing in the

stalking, abuse, intimidation, domestic violence, dating violence, sexual harassment and gender

based discrimination, when they based their decisions about how to respond to reports that

Melvin Rowland was stalking, abusing, intimidating, sexually harassing and discriminating

against Lauren on irrational gender stereotypes, thereby dismissing the situation as one involving

behavior that is acceptable in the context of a relationship with an intimate partner and

employing unacceptable mentalities that blame women for the abuse of men..

126.    Individual Defendants' use of classification based on gender and their differential

treatment on the basis of gender was not substantially related to achieving an important

government interest.

127.    The deprivation of equal protection under the law left Lauren vulnerable to

ongoing stalking, abuse, intimidation, domestic violence, dating violence, sexual harassment, and

gender based discrimination, indicating that Independent Defendants silently condoned Melvin

Rowland's conduct.

128.    The deprivation of equal protection under the law exposed Lauren to further

incidences of sexual harassment, culminating in a brutal attack that resulted in her murder and a

permanent deprivation of her access to education.

129.    Plaintiffs otherwise suffered additional harm and incurred damages as a result of

the deprivation of equal protection.

**Third Cause of Action**
**(MUNICIPAL LIABILITY – VIOLATION OF EQUAL PROTECTION**
**UNDER FOURTEENTH AMENDMENT – 42 U.S.C. § 1983)**

130.    Plaintiffs incorporate by this reference all previous paragraphs above as though

fully set forth below.

131.     Individual Defendants and others were officials of the University with final policy making authority.

132.     University officials with final policy making authority had a duty to respond to reports of stalking, abuse, intimidation, domestic violence, dating violence, sexual harassment and gender based discrimination against Lauren.

133.     University officials with final policy making authority exercised discretion at the moment when they decided how they would respond to reports that Melvin Rowland was stalking, abusing, intimidating, sexually harassing and discriminating against Lauren on the basis of her gender.

134.     The duty to respond and power to exercise discretion in determining how University officials with final policy making authority would respond to reports that Melvin Rowland was abusing, intimidating, sexually harassing and discriminating against Lauren on the basis of her gender was possessed by virtue of state law and made possible only because state law vested such officials with the authority to respond to such reports.  Accordingly, University officials with final policy making authority were acting under color of state law when they exercised discretion in determining how they would respond to reports that Melvin Rowland was abusing, intimidating, sexually harassing and discriminating against Lauren on the basis of her gender.

135.     In determining how to exercise their discretion in responding to reports that Melvin Rowland was abusing, intimidating, sexually harassing and discriminating against Lauren on the basis of her gender, through information and belief, University officials with final policy making authority based their decisions on irrational gender stereotypes through the

mechanical application of traditional, yet inaccurate, assumptions about the nature of men and women and their proper roles in society, including but not limited to gender stereotypes indicating: that women are unreasonable, irrational, hysterical and hypersensitive; that women overreact to situations; that women are spiteful; that women report abuse or harassment to get attention; that women have ulterior motives when they report abuse or harassment; that women are often untruthful when they report abuse or harassment; that men often have a legitimate reason for abusing or harassing women; that women often deserve, encourage, provoke or enjoy the harassment or abuse that they report; that women who look or act a certain way are "tramps" or "sluts;" that women send mixed signals to men; that women cannot be trusted and that men are therefore justified in questioning their fidelity; that men cannot control their primal urges; that women have the power to end harassment or abuse on their own; that a woman who is being harassed or abused will always seek help on their own behalf; that women should be accommodating and subservient to men; that men have the right to exercise authority over women; and/or that women hate men and will take drastic measures to cause them harm.

136.    The University, through its officials with final policy making authority, classified Lauren by her gender and engaged in differential treatment that violated Lauren's right to equal protection under the Fourteenth Amendment of the United States Constitution, thereby acquiescing in the stalking, abuse, intimidation, domestic violence, dating violence, sexual harassment and gender based discrimination, when they were deliberately indifferent to the reports that Melvin Rowland was stalking, abusing, intimidating, sexually harassing and discriminating against Lauren.

137.    Additionally or in the alternative, the University, through its officials with final policy making authority, classified Lauren by her gender and engaged in differential treatment that violated Lauren's right to equal protection under the Fourteenth Amendment of the United States Constitution, thereby acquiescing in the stalking, abuse, intimidation, domestic violence, dating violence, sexual harassment and gender based discrimination, when they based their decisions about how to respond to reports that Melvin Rowland was stalking, abusing, intimidating, sexually harassing and discriminating against Lauren on irrational gender stereotypes, thereby dismissing the situation as one involving behavior that is acceptable in the context of a relationship with an intimate partner and employing unacceptable mentalities that blame women for the abuse of men.

138.    Alternatively, even if Individual Defendants and others were not officials of the University with final policy making authority, their response to the sexual harassment based on irrational gender stereotypes, their use of classification based on gender, their differential treatment based on the use of classification based on gender, their failure to investigate or otherwise respond to the sexual harassment at issue, their deliberate indifference to the sexual harassment at issue and their failure to implement appropriate policies and procedures that were obviously necessary to address a serious and risk of sexual assault, domestic violence and dating violence on campus, were representative of an official policy or custom of the University and deprived Lauren of her constitutional right to equal protection under the Fourteenth Amendment.

139.    The use of classification based on gender by University officials with final policy making authority and their differential treatment on the basis of gender was not substantially related to achieving an important government interest.

140.    The deprivation of equal protection under the law left Lauren vulnerable to ongoing stalking, abuse, intimidation, domestic violence, dating violence, sexual harassment, and gender based discrimination, indicating that University officials with final policy making authority silently condoned Melvin Rowland's conduct.

141.    The deprivation of equal protection under the law exposed Lauren to further incidences of sexual harassment, culminating in a brutal attack that resulted in her murder and a permanent deprivation of her access to education.

142.    Plaintiffs otherwise suffered additional harm and incurred damages as a result of the deprivation of equal protection.

143.    To the extent that employees or agents of the University were officials with final policy making authority, knowledge obtained by such employees or agents within the course and scope of the employment or agency relationship is imputed to the University and to other University officials with final policy making authority.

144.    The University is independently liable for action that it took or failed to take in light of the knowledge that was imputed to it through employees or agents of the University who were University officials with final policy making authority.

**FOURTH CAUSE OF ACTION**
**(FAILURE TO TRAIN – VIOLATION OF EQUAL PROTECTION**
**UNDER FOURTEENTH AMENDMENT – 42 U.S.C. § 1983)**

145.    Plaintiffs re-allege and incorporate herein the previous allegations of this complaint.

146.    At all times relevant hereto, the University was a local governing body and administrator with final policy making authority who was acting under color of state law and, on

information and belief, engaged in policy making to supervise and control all policies, practices, rules, guidelines, customs and regulations regarding the University and its students.

147.    At all times relevant hereto, Dale Brophy was an administrator who had final policymaking authority by way of his official capacity as the Chief of Police for UUPS who was acting under color of state law and who, on information and belief engaged in policy making to supervise and control all policies practices, rules, guidelines, customs and regulations regarding UUPS and its interaction with students.

148.    At all times relevant hereto, John/Jane Doe was an administrator who had final policymaking authority by way of his/her official capacity with the Department of Housing who was acting under color of state law and who, on information and belief engaged in policy making to supervise and control all policies practices, rules, guidelines, customs and regulations regarding the Department of Housing and its interaction with students.

149.    At all times relevant hereto, the University, Chief Dale Brophy and John/Jane Doe had duties to train, but failed to properly or sufficiently train their officials, administrators, employees, agents, staff, students and parents with regard to, among other things, stalking, abuse, intimidation, domestic violence, dating violence, intimate partner violence, sexual misconduct, sexual harassment or gender based discrimination; rights, remedies, duties, requirements and obligations under Title IX;, recognizing and identifying the warning signs of abusive behavior; investigating, reporting, and remedying the effects of sexual harassment and gender based discrimination against students like Lauren McCluskey; properly responding to and remediating continued sexual harassment and gender based discrimination occurring on its campus and specifically directed towards students like Lauren McCluskey after such has been reported;

gender based stereotypes and the rights, remedies, duties, requirements and obligations under the equal protection clause of the Fourteenth Amendment.

150.    The University, Chief Brophy and John/Jane Doe failed to train their officials, administrators, employees, agents, staff, students and parents despite the plainly obvious need for training with regard to, among other things, stalking, abuse, intimidation, domestic violence, dating violence, intimate partner violence, sexual misconduct, sexual harassment or gender based discrimination; rights, remedies, duties, requirements and obligations under Title IX;, recognizing and identifying the warning signs of abusive behavior; investigating, reporting, and remedying the effects of sexual harassment and gender based discrimination against students like Lauren McCluskey; properly responding to and remediating continued sexual harassment and gender based discrimination occurring on its campus and specifically directed towards students like Lauren McCluskey after such has been reported; gender based stereotypes and the rights, remedies, duties, requirements and obligations under the equal protection clause of the Fourteenth Amendment.

151.    Numerous authorities, including the U.S. Supreme Court and U.S. Department of Education, made clear and gave notice to the University that University employees will confront sexual harassment and abuse directed toward students with regularity, given the high predictability, recurrence and prevalence of sexual assault, harassment and abuse on university campuses and on the University's campus.  Thus, it was foreseen and inevitable that University officials, officials, administrators, staff, employees, agents, students and parents would encounter recurrent situations involving sexual abuse that implicated students' Constitutional and federal rights, and it did, in fact, encounter those recurring situations.

46

152.     The University, Chief Dale Brophy and John/Jane Doe failed to adequately train their officials, administrators, staff, employees, agents, students and parents, and thereby prohibit or discourage foreseeable conduct, despite the clearly established and well-known known dangers of stalking, abuse, intimidation, domestic violence, dating violence, intimate partner violence, sexual misconduct, sexual harassment and gender based discrimination faced by students on university campuses in the United States, and thereby was deliberately indifferent.

153.     Through their failure to train officials, administrators, staff, employees, agents, students and parents, the University, Dale Brophy and John/Jane Doe had a policy, practice and custom of deliberate indifference to the rights of students like Lauren McCluskey.  The lack of training left University officials unequipped to prohibit or discourage readily foreseeable conduct, despite the clearly established and well known dangers of sexual harassment, domestic violence and dating violence on university campuses and on the University of Utah campus in particular.  As a result, the University, Chief Dale Brophy and John/Jane Doe subjected Lauren to the deprivation of her constitutional right to equal protection under the Fourteenth Amendment and of her federal civil rights under Title IX.

154.     The University, Chief Brophy and John/Jane Doe's failure to train its officials, administrators, employees, agents, staff, students and parents effectively denied Lauren McCluskey's clearly established federal rights and Constitutional rights.  The University, Chief Dale Brophy and John/Jane Doe's failure to train officials, administrators, staff, students and parents was deliberate, reckless and in callous indifference to Lauren McCluskey's federally protected rights.

155.    As a direct and proximate result of the University, Chief Dale Brophy and John/Jane Doe's actions, inactions, deliberate indifference to and violation of Lauren McCluskey's clearly established Constitutional and federal rights, Lauren McCluskey suffered injuries, including but not limited to emotional distress, psychological trauma, severe physical harm and death.

156.    To the extent that the employees or agents of the University had final policymaking authority, knowledge obtained by such employees or agents is imputed to the University and to other employees or agents of the University with final policy making authority.

157.    The University is independently liable for action that it took or failed to take in light of the knowledge that was imputed to it through employees or agents of the University with final policymaking authority.

### FIFTH CAUSE OF ACTION
### (INTEREST ON MONEY JUDGMENT)

158.    Plaintiffs re-allege and incorporate herein the previous allegations of this complaint.

159.    As a proximate result of Defendants' violation of Title IX and Defendants' deprivation of Lauren's right to equal protection under the Fourteenth Amendment, Plaintiffs suffered injuries and incurred damages.

160.    Pursuant to federal law, Plaintiffs are entitled to receive pre-judgment interest from the date of the incident on all damages that have been or will be incurred as a result of their injuries as an element of complete compensation.

161.    Pursuant to 28 U.S.C. §1961, Plaintiffs are entitled to receive interest from the date of the entry of judgment on all damages awarded pursuant to such judgment.

162.     The amount related to interest on money judgment that Plaintiffs sustained as a proximate result of Defendants' acts or omissions will be proven at trial.

**RELIEF REQUESTED**

**WHEREFORE**, Plaintiffs request the following relief:

1.     For their First Cause of Action, Plaintiffs seek judgment against the University for $56,000,000, an amount in excess of the minimum jurisdictional amount for, among other things, loss of access to educational opportunities and benefits, tuition and related expenses, dormitory housing and related expenses, personal injuries, pain and suffering, loss of chance, mental anguish, medical expenses, impaired earning capacity, lost wages, household services, the value of services that Lauren would have provided, loss of society, comfort, association, love, counsel, care, consortium and protection, loss of the reasonable expectation of Mr. and Mrs. McCluskey to associate with Lauren, and other special and general damages; for punitive damages; for permission to amend this Complaint and to add parties and causes of action at a later date consistent with evidence adduced through discovery; for prejudgment interest, for post judgment interest, for the costs of this suit, including attorney's fees and for such further relief as the Court deems proper.

2.     For their Second Cause of Action, Plaintiffs seek judgment against Individual Defendants for $56,000,000, an amount in excess of the minimum jurisdictional amount for, among other things, loss of access to educational opportunities and benefits, tuition and related expenses, dormitory housing and related expenses, personal injuries, pain and suffering, loss of chance, mental anguish, medical expenses, impaired earning capacity, lost wages, household services, the value of services that Lauren would have provided, loss of society, comfort,

association, love, counsel, care, consortium and protection, loss of the reasonable expectation of Mr. and Mrs. McCluskey to associate with Lauren, and other special and general damages; for punitive damages; for permission to amend this Complaint and to add parties and causes of action at a later date consistent with evidence adduced through discovery; for prejudgment interest, for post judgment interest, for the costs of this suit, including attorney's fees and for such further relief as the Court deems proper.

3.      For their Third Cause of Action, Plaintiffs seek judgment against the University for $56,000,000, an amount in excess of the minimum jurisdictional amount for, among other things, loss of access to educational opportunities and benefits, tuition and related expenses, dormitory housing and related expenses, personal injuries, pain and suffering, loss of chance, mental anguish, medical expenses, impaired earning capacity, lost wages, household services, the value of services that Lauren would have provided, loss of society, comfort, association, love, counsel, care, consortium and protection, loss of the reasonable expectation of Mr. and Mrs. McCluskey to associate with Lauren, and other special and general damages; for punitive damages; for permission to amend this Complaint and to add parties and causes of action at a later date consistent with evidence adduced through discovery; for prejudgment interest, for post judgment interest, for the costs of this suit, including attorney's fees and for such further relief as the Court deems proper.

4.      For their Fourth Cause of Action, Plaintiffs seek judgment against the University, against Chief Dale Brophy and against John/Jane Doe for $56,000,000, an amount in excess of the minimum jurisdictional amount for, among other things, loss of access to educational opportunities and benefits, tuition and related expenses, dormitory housing and related expenses,

personal injuries, pain and suffering, loss of chance, mental anguish, medical expenses, impaired earning capacity, lost wages, household services, the value of services that Lauren would have provided, loss of society, comfort, association, love, counsel, care, consortium and protection, loss of the reasonable expectation of Mr. and Mrs. McCluskey to associate with Lauren, and other special and general damages; for punitive damages; for permission to amend this Complaint and to add parties and causes of action at a later date consistent with evidence adduced through discovery; for prejudgment interest, for post judgment interest, for the costs of this suit, including attorney's fees and for such further relief as the Court deems proper.

5.      For their Fifth Cause of Action, Plaintiffs seek prejudgment interest from the date of the incident on all damages that have been or will be incurred as a result of their injuries and post-judgment interest from the date of the entry of judgment on all damages that have been or will be incurred as a result of their injuries.

### JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs have tendered the statutory jury fee and demand a trial by jury for all of the issues that can be tried by a jury.

DATED this 27th day of June, 2019.

PARKER & McCONKIE

/s/ James W. McConkie
James W. McConkie
*Attorney for Plaintiffs*

Plaintiffs' Address:
Jill and Matthew McCluskey
c/o James W. McConkie
PARKER & McCONKIE
5664 South Green Street
Salt Lake City, Utah 84123